NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| HOWARD SALAMON d/b/a SALAMON BROTHERS, | : | |
| | : | |
| | : | |
| | : | **OPINION** |
| Plaintiff, | : | |
| | : | Civ. No. 05-2058 (WHW) |
| v. | : | |
| | : | |
| TELEPLUS ENTERPRISES, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**Walls, Senior District Judge**

Pursuant to Fed. R. Civ. P. 56, Defendant Teleplus Enterprises, Inc. ("Teleplus") moves for summary judgment to dismiss Plaintiff Howard Salamon d/b/a Salamon Brothers's ("Salamon") Complaint and to grant its counterclaim and affirmative defense under § 29(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78cc(b), for violations of § 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1), and its breach of fiduciary duty affirmative defense. Plaintiff Salamon also moves for summary judgment pursuant to Fed. R. Civ. P. 56, to dismiss Teleplus's counterclaim and affirmative defense under § 29(b) of the Exchange Act, its counterclaim under the New Jersey Consumer Fraud Act (the "CFA"), N.J.S.A. § 56:8-2, and its breach of fiduciary duty affirmative defense. The motions are denied.

## FACTS AND PROCEDURAL BACKGROUND

This action arises from Defendant Teleplus's alleged breach of a letter of agreement (the "Salamon-Teleplus Consulting Agreement"). On April 18, 2005, Plaintiff Salamon filed his Complaint against Teleplus, which alleges breach of contract and seeks relief in the forms of

NOT FOR PUBLICATION

specific performance, money damages, and declaratory judgment.  On July 11, 2005, Cornell

Capital Partners, L.P. ("Cornell") moved to intervene pursuant to Fed. R. Civ. P. 24(b)(2); the

Court granted its motion on August 4, 2005.  Cornell filed its Intervenor Complaint on October

26, 2005.  Teleplus filed its Third Amended Answer to Complaint and Counterclaims on April

15, 2007, asserting six affirmative defenses and two counterclaims – (1) under § 29(b) of the

Exchange Act, 15 U.S.C. § 78cc(b), for violations of § 15(a)(1) of the Exchange Act, 15 U.S.C. §

78o(a)(1); and (2) under the CFA, N.J.S.A. § 56:8-2.  On April 23, 2007, Teleplus filed its

motion for summary judgment; on April 25, 2007, Salamon filed his motion for summary

judgment.  The Court held oral argument on those motions on May 14, 2008.

Salamon "is involved in finding funding and financing for companies unable to obtain

traditional asset-collateralized bank loans."  (Pl.'s Local Rule 56.1 Statement of Undisputed

Facts (No. 52-2) ("Pl.'s S.F. (No. 52-2)") ¶ 1.)  Teleplus is "a distributor of cellular devices and

wireless telephone service."  (Id. ¶ 2.)  Cornell is "a private lender based in Jersey City, New

Jersey."  (Id. ¶ 5.)

**1.     Salamon-Cornell Consulting Agreement**

In July 2002, Salamon and Cornell entered into a consulting services agreement (the

"Salamon-Cornell Consulting Agreement"), which provided that Salamon "desires to perform as

an independent contractor to provide certain consulting and advisory services to Cornell as

designated below, and [Salamon] desires to accept such engagement by Cornell, pursuant to the

terms and conditions."  (Def.'s Mot. for Summ. J., Ex. A (No. 51).)  Under "Scope of Services,"

Salamon's "Duties and Performance" were described as "[f]rom time to time . . . [Salamon] shall

NOT FOR PUBLICATION

provide such advisory services to Cornell with regards to certain business opportunities with

entities . . . known to [Salamon]; the Services may include various types of financial

arrangements, including direct investment by Cornell into these Entities."  (Id.)  Salamon's

relationship to Cornell was that of an independent contractor, as the Salamon-Cornell Consulting

Agreement stated:

> The parties agree that [Salamon] is an independent contractor performing Services
> hereunder and not an employee of Cornell. . . .  Nothing herein or in the
> performance hereof shall imply either a joint venture or principal and agent
> relationship between the parties, nor shall either such relationship be deemed to
> have arisen under this Agreement.

(Id.)  Under "Compensation and Expenses," Cornell paid Salamon a "Finders Fee" "[i]n respect

to any equity line of credit financing by Cornell to an Entity introduced directly by [Salamon] to

Cornell which is made recommended or advised upon by" Salamon, in the amount of "ten

percent (10%) of the gross stock compensation received by Cornell from the Entity."  (Id.)

>    **2.**        **Salamon-Teleplus Consulting Agreement**

On January 5 and 7, 2004, Teleplus and Salamon, respectively, executed the Salamon-

Teleplus Consulting Agreement, which provided that Teleplus "will compensate [Salamon] a

finder's fee of Ten Percent(10%) of the total received amount that [Salamon] provides , through

the funding source."  (Def.'s Mot. for Summ. J., Ex. F (No. 51); Pl.'s Mot. for Summ. J., Ex. 4

(No. 52-5).)  Further, the Salamon-Teleplus Consulting Agreement stated that "[t]he consultant

fees are to be paid by [Teleplus] in the form of Cash on [sic] the amount equal to 10% . . . of the

received funds that the agent provides [Teleplus] through his funding sources" and that "[t]he

**NOT FOR PUBLICATION**

Cash represent [sic] 10% of the amount of received funding."  (Def.'s Mot. for Summ. J., Ex. F

(No. 51); Pl.'s Mot. for Summ. J., Ex. 4 (No. 52-5).)

> **3.     The Transactions Between Teleplus and Cornell**

Following execution of the Salamon-Teleplus Consulting Agreement, Salamon

introduced Teleplus to Cornell.  (Pl.'s S.F. (No. 52-2) ¶ 5.)  Teleplus and Cornell later entered

into a securities purchase agreement (the "Securities Purchase Agreement") whereby Teleplus

received $1 million for convertible debentures.  (Def.'s Statement of Undisputed Facts (No. 49-

3) ("Def.'s S.F.") at 6.)  Teleplus and Cornell also entered into a standby equity distribution

agreement (the "SEDA") whereby Cornell "provided for funding up to a total of $10 million" for

Teleplus stock.  (Id.)  Pursuant to the Securities Purchase Agreement and the SEDA, Teleplus

has received at least $12 million in funding from Cornell.[1]  (Pl.'s S.F. (No. 52-2) ¶ 6; Pl.'s Local

Rule 56.1 Statement of Undisputed Facts (No. 58-3) ("Pl.'s S.F. (No. 58-3)") ¶ 6.)

A matter of major dispute between the parties is Salamon's role in the transactions

between Teleplus and Cornell – the Securities Purchase Agreement and the SEDA.  Teleplus

argues that Salamon played a substantial role in the negotiations between Teleplus and Cornell,

and points to a number of Court submissions and discovery documents which allegedly support

its position – as examples:

---

[1]  Despite presenting in his Statements of Facts that Teleplus "received at least $12 million in funding from Cornell," Salamon asserts throughout his memoranda that Teleplus received $13 million in funding from Cornell.

NOT FOR PUBLICATION

- In his Complaint Salamon alleges that "Salamon introduced [Teleplus] to [Cornell]" and "set up telephone conference calls and meetings between Cornell and [Teleplus] and participated in the conference calls in connection with [Teleplus's] efforts to obtaining [sic] financing from Cornell."  (Compl. (No. 1) ¶ 9.)

- In an affidavit filed on June 8, 2005, Salamon stated:

In further performance of the [Salamon-Teleplus Consulting Agreement], [Salamon] set up telephone conference calls and meetings between Cornell . . . and [Teleplus], participated in the conference calls and advised [Teleplus] in connection with its efforts to obtaining [sic] financing from Cornell.  These efforts resulted in [Teleplus's] CEO, Marius Silvasan traveling to Cornell['s] . . . headquarters in Jersey City on two separate occasions to negotiate the terms of, and close on, financing provided by Cornell . . . .[2]

(Aff. of Howard Salamon (No. 5) ¶ 6.)

- In response to Teleplus's interrogatory requesting that Salamon "IDENTIFY ALL 'telephone conference calls and meetings between CORNELL AND DEFENDANT in which PLAINTIFF participated . . . in connection with [DEFENDANT'S] efforts to obtain financing from [CORNELL],'" Salamon indicated three occasions.  (Def.'s Mot. for Summ. J., Ex. N (No. 51-2).)

- In a February 11, 2004 e-mail from Salamon to Cornell representative George Kanakis, Salamon wrote:

[Cornell representative] Brian [Keane] was suppose [sic] to send out a revised term sheet yesterday to [Teleplus].I did not receive it.Also Brian was suppose [sic] to fax and then mail out to me the signed convertible and equity line signature pages yesterday,I did not receive anything.

(Id., Ex. O (No. 51-2) at CT 0630.)

---

[2]  In a later certification filed on August 2, 2005, Salamon included almost identical language as that found in his affidavit, though he omitted that he "participated in the conference calls and advised [Teleplus] in connection with its efforts to obtaining [sic] financing from Cornell" and, in the next sentence, replaced the word "efforts" with the phrase "phone call and meetings."  (Cert. of Howard Salamon (No. 11-2) ¶ 10.)

**NOT FOR PUBLICATION**

- In a May 13, 2004 e-mail from Salamon to Kanakis, Salamon wrote:

I spoke with [Teleplus Chief Executive Officer] Marius Silvasan . . . .He would like to see if he can get $1 M up front and if he can ----------------- Would you be so kind to put it on a piece of paper to show him what it looks like as a convertible structure?

You were right,you were offering him $1M as a promissory note once the shares were registered.

      (<u>Id.</u> at CT 0784.)

- In an e-mail chain spanning from May 18, 2004 to May 19, 2004 between Salamon, Kanakis, and Keane, Kanakis wrote to Salamon:

Cornell is still interested in doing business with [Teleplus] but Marius [Silvasan] just better not start throwing around the word death spiral withour [sic] deals when we offer him this convertible..His company had a market cap of $280MM at one point and is now at less than $50MM - It would seem for a while he was shopping his deal around for a long time while his stock started to flounder and when it came down to it he came back to Cornell - Nowm [sic] he asks is Cornell still interested in the deal?  Do you know why he waited so long to pull the trigger?

      (<u>Id.</u> at CT 0550.)  Salamon responded:

As he told me he was waiting for all the money to come in from a $1 M private placement.

      (<u>Id.</u>)

- In an e-mail chain from May 20, 2004 between Salamon and Silvasan, Salamon wrote to Silvasan:

Herewith is the term sheet for financing from Cornell . . . .Please let me know how you would like to proceed.

      (<u>Id.</u> at S-0416.)  Silvasan responded:

Howard, please set a call sometime this afternoon to discuss Cornell's documents.

      (<u>Id.</u>)

-6-

**NOT FOR PUBLICATION**

•     The following exchange from Salamon's deposition:

Q.     Did you provide advice to [Teleplus] in its efforts to obtain financing from Cornell?

A.     Yes.

Q.     Did you participate in conference calls with [Teleplus] and Cornell?

A.     When I had to.

     . . . .

Q.     Did you, in fact, receive documents regarding the financing that Cornell provided to [Teleplus] directly from Cornell?

     MR. BERRY: If you recall.

A.     Possibly, I don't remember.

Q.     Do you recall discussing documents that were provided by Cornell to [Teleplus] with Mr. Silvasan?

A.     No, I don't recall.

Q.     Do you recall transmitting any document that you received from Cornell directly to Mr. Silvasan?

A.     Yes.

(Id., Ex. R (No. 51-5) ("Dep. (Salamon)") at 93:13-94:9.)

According to Salamon, however, he "did not participate in any negotiations between Teleplus and Cornell."  (Pl.'s S.F. (No. 52-2) ¶ 7; see Cert. of Howard Salamon (No. 52-4) ¶ 2.) Salamon alleges that deposition testimony from Keane and Kanakis confirms that he did not participate in negotiations – as examples:

-7-

**NOT FOR PUBLICATION**

- The following exchange from Keane's deposition:

Q.      Do you recall what Mr. Salamon may have said in any of those phone calls [which he set up for Cornell and Teleplus]?

A.      I think he introduced himself.  He introduced himself, and that was really it.

(Pl.'s Opp. to Def.'s Mot. for Summ. J., Ex. 5 (No. 58-4) at 18:6-9.)

- The following exchange also from Keane's deposition::

Q.      And what about [Salamon's] participation in subsequent calls?

A.      Like I said, it was very sporadic.

Q.      But it did occur?

A.      Yes.  He would initiate a call at various times, and that was the extent of, I guess, his involvement.

Q.      Do you recall him saying anything during these conversations?

A.      Other than him announcing himself in the beginning of the call, not really.

Q.      Now, with respect to meetings between Cornell and [Teleplus], do you recall Mr. Salamon being present at any of those meetings?

A.      I'm fairly certain that he was in the first meeting.  He came with the company to the first face-to-face meeting.

        . . . .

Q.      Do you recall anything Mr. Salamon said at that first meeting?

A.      Not really, no.  Except for, you know, a greeting, and that's really it.

(Id. at 26:10-27:18.)

-8-

**NOT FOR PUBLICATION**

- The following exchange from Kanakis's deposition:

Q.   Did you seek Mr. Salamon's input concerning [the initial negotiations of the fees, the amount of funding, the nature of the security and the pricing formula with respect to the first transaction with Teleplus]?

A.   NO.

. . . .

Q.   With respect to the second transaction with Teleplus, were the initial negotiations of the fees, the amount of funding, the nature of the security and the pricing formula done by yourself and Mr. Keane?

A.   Yes.

. . . .

Q.   Did you seek Mr. Salamon's input concerning that?

A.   No.

(<u>Id.</u>, Ex. 9 (No. 58-4) at 170:4-171:6.)

**4.      Proposed Reduced Fee Arrangement**

At some point Teleplus learned that Salamon "was not <u>the</u> 'Solomon [sic] Brothers,'"

when Salamon "specifically requested that [Silvasan] make the $100,000 payment in

[Salamon's] individual name, <u>i.e.</u>, to 'Howard Salamon,' rather than to 'Solomon [sic]

Brothers.'"  (Aff. of Marius Silvasan (No. 10-2) ¶ 8; <u>see</u> Pl.'s Opp. to Def.'s Mot. for Summ. J.,

Ex. 6 (No. 58-4) ("Dep. (Silvasan)") at 179:22-180:23.)  When asked during his deposition what

he did "in connection with finding out who Mr. Salamon actually was" after Salamon's request

for the check to be made out in his name, Silvasan answered that he "didn't take specific steps to

confirm [his] doubts or not at that time."  (Dep. (Silvasan) at 180:9-13.)  According to Salamon,

NOT FOR PUBLICATION

however, "[i]n September 2004, Teleplus proposed that Salamon enter into a reduced fee arrangement," (Pl.'s S.F. (No. 52-2) ¶ 8), with much more extensive terms, (see Pl.'s Mot. Summ. J., Ex. 7 (No. 52-5)).  Salamon asserts that he "refused to sign the reduced fee agreement."  (Pl.'s S.F. (No. 52-2) ¶ 9.)

     **5.**     **Salamon's Compensation from Teleplus and Cornell**

Salamon has received $100,000.00 from Teleplus.  (Id. ¶ 10.) Additionally, "[i]f [Salamon] received any compensation from Cornell for referring Teleplus to it, such compensation was only approximately $4,000.00."  (Cert. of Howard Salamon (No. 58-2) ¶ 6; Pl.'s S.F. (No. 58-3) ¶ 14.)

**LEGAL STANDARD**

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-moving party, and it is material if, under the substantive law, it would affect the outcome of the suit.  Id. at 248.  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

NOT FOR PUBLICATION

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence in his favor. Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324. "Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment." Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. Id. at 255; Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

**DISCUSSION**

As stated, each party by summary judgment motion, seeks the dismissal of the adversary's claims, counterclaims, and affirmative defenses.[3]

---

[3] As an initial matter, the Court notes that neither party has raised any choice of law arguments. Plaintiff Salamon is a resident of New York, and Defendant Teleplus is incorporated in Nevada and has a principal place of business in Quebec, Canada. Intervenor Cornell has a principal place of business in New Jersey. In their motions for summary judgment, both Salamon and Teleplus appear to assume the applicability of New Jersey law. Accordingly, the

NOT FOR PUBLICATION

1.      **Counterclaim and Affirmative Defense Under Section 29(b) of the Exchange Act**

Defendant Teleplus's chief position is that despite its alleged breach of the Salamon-Teleplus Consulting Agreement, § 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), provides for the rescission of the Salamon-Teleplus Consulting Agreement, and Teleplus asserts a counterclaim and an affirmative defense addressing this position.  Section 29(b) reads:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . .

The "violation of any provision of this chapter" that Teleplus alleges is that of § 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1), which provides:

> It shall be unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

---

Court chooses not to address the issue of choice of law sua sponte.  See, e.g., Integral Res. (PVT) Ltd. v. Istil Group, Inc., 155 Fed. Appx. 69, 73 (3d Cir. 2005); In re Korean Air Lines Disaster of Sept. 1, 1983, 932 F.2d 1475, 1495 (D.C. Cir. 1991) (Mikva, J., dissenting); Lipin v. Hunt, 538 F. Supp. 2d 590, 599-600 (S.D.N.Y. 2008); C & E Servs., Inc. v. Ashland, Inc., 498 F. Supp. 2d 242, 255 n.5 (D.D.C. 2007); Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 478 n.7 (D.N.J. 2002).

NOT FOR PUBLICATION

Accordingly, Teleplus asserts that because Plaintiff Salamon "effected" its securities transactions with Cornell – the Securities Purchase Agreement and the SEDA – specifically through his alleged participation in the negotiations of these transactions, he violated § 15(a)(1) because he is not a registered broker or dealer,[4] and not only can he not recover any commission under the Salamon-Teleplus Consulting Agreement, but it should be rescinded under § 29(b).

     **A.**    **Applicability of § 29(b)**

According to the Third Circuit, "[s]ection 29(b) itself does not define a substantive violation of the securities laws; rather, it is the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 205 (3d Cir. 2006). Teleplus must establish three elements in order to void the Salamon-Teleplus Consulting Agreement under § 29(b) – "(1) the contract involved a prohibited transaction; (2) [Teleplus] is in contractual privity with [Salamon]; and (3) [Teleplus] is in the class of persons that the securities acts were designed to protect." Id. (citing Regional Props., Inc. v. Fin. & Real Estate Consulting Co., 678 F.2d 552, 559 (5th Cir. 1982)). Moreover, Teleplus "must demonstrate a direct relationship between the violation at issue and the performance of the contract; i.e., the violation must be 'inseparable from the performance of the contract' rather than 'collateral or tangential to the contract.'" Id. (quoting GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 201 (3d Cir. 2001)).

---

    [4] Salamon does not dispute that he is not a registered broker or dealer. (See Reply Cert. of Howard Salamon (No. 63) ¶ 5.)

NOT FOR PUBLICATION

Salamon argues that "[u]nder the law of the Third Circuit, § 29(b) of the [Exchange] Act

applies only to transactions which are inherently unlawful and could not, in any circumstances, be

performed in a legal manner," which is not the case here.  (Pl.'s Mem. in Support of Pl.'s Mot.

Summ. J. (No. 53) ("Pl.'s Mem. (No. 53)") at 22; Pl.'s Mem. in Opp. to Def.'s Mot. Summ. J.

(No. 59) ("Pl.'s Mem. (No. 59)") at 21.)  Salamon suggests that any violation was collateral or

tangential to the Salamon-Teleplus Consulting Agreement because "Salamon obviously could

perform . . . by acting as an intermediary and locating potential sources of funding without acting

as an unlicensed securities broker or engaging in any unlawful activity," (Pl.'s Mem. (No. 59) at

22), and because the Salamon-Teleplus Consulting Agreement "does not even specify that a

securities transaction would necessarily be involved," (Pl.'s Mem. (No. 53) at 23).  Teleplus

replies that Salamon misinterprets Third Circuit precedent, claiming that "the Court did not hold

that if the [Salamon-Teleplus Consulting Agreement] could have possibly been performed legally,

it is not subject to rescission," (Def.'s Reply Mem. in Support of Def.'s Mot. Summ. J. (No. 61)

("Def.'s Reply Mem. (No. 61)") at 9), and references a Fifth Circuit case, Regional Properties,

which "dismissed the same argument which Salamon urges, that the [Salamon-Teleplus

Consulting Agreement] must be 'Necessarily Illegal,'" (Def.'s Mem. in Opp. to Pl.'s Mot. Summ.

J. (No. 57) ("Def.'s Mem. (No. 57)") at 9).  Teleplus notes that the three elements necessary to

maintain a claim under § 29(b) are satisfied in this case.  (See Def.'s Mem. (No. 57) at 11-12.)

The issue is whether Salamon's alleged violation of § 15(a)(1) – i.e., his alleged activity as

an unregistered broker or dealer in effecting Teleplus's securities transactions with Cornell – is

"inseparable from the performance" of the Salamon-Teleplus Consulting Agreement or "collateral

-14-

**NOT FOR PUBLICATION**

or tangential" to the Salamon-Teleplus Consulting Agreement.  The Salamon-Teleplus Consulting

Agreement provides, in pertinent part, that Teleplus "will compensate [Salamon] a finder's fee of

Ten Percent(10%) of the total received amount that [Salamon] provides , through the funding

source."  (Def.'s Mot. for Summ. J., Ex. F (No. 51); Pl.'s Mot. for Summ. J., Ex. 4 (No. 52-5).)

The financing that Salamon facilitates for Teleplus goes to the heart of the Salamon-Teleplus

Consulting Agreement.  As a result Salamon's actions in facilitating Teleplus's receipt of the

financing is inseparable from the performance of the Salamon-Teleplus Consulting Agreement.

The Court concludes that any violation of § 15(a)(1) would have been inseparable from the

performance of the Salamon-Teleplus Consulting Agreement.

As recounted above, Salamon essentially offers two arguments to support his claim that

any alleged violation of § 15(a)(1) is collateral or tangential to the Salamon-Teleplus Consulting

Agreement – (1) Salamon did not have to act as a broker or dealer in order to perform under it;

and (2) the Salamon-Teleplus Consulting Agreement did not, by its terms, require a securities

transaction.  In Regional Properties, cited approvingly by the Third Circuit in GFL Advantage

Fund, 272 F.3d at 201, and Berckeley Investment Group, 455 F.3d at 206, the Fifth Circuit

declared that "[s]ection 29(b) does not render void only those contracts that 'by their terms'

violate the Act" and  "[i]nterpret[ed] section 29(b) to render voidable those contracts that are

either illegal when made or as in fact performed."  678 F.2d at 560.  In light of this, the Court is

not persuaded by Salamon's arguments.[5]

---

[5]  Indeed, the facts appear to belie Salamon's claim that he theoretically could have
performed pursuant to the Salamon-Teleplus Consulting Agreement without the involvement of a
securities transaction.  Salamon describes his business as "finding funding and financing for

NOT FOR PUBLICATION

### B.    Broker or Finder

Section 15(a)(1) provides that a broker or dealer must be registered in order to effect a transaction in securities.  Because Salamon admits to not being registered as a broker or dealer, the issue is whether Salamon had the status of a broker or dealer during the course of the transactions between Teleplus and Cornell.  If so, Teleplus would satisfy the § 29(b) element requiring that "the contract involved a prohibited transaction."

Under the Exchange Act, a "broker" is defined as "any person engaged in the business of effecting transactions in securities for the account of others."[6]  15 U.S.C. § 78c(a)(4)(A).  "In determining whether a particular individual or entity falls within th[e] definition [of a broker], courts consider whether the individual may be 'characterized by 'a certain regularity of

---

companies unable to obtain traditional asset-collateralized bank loans," (Pl.'s S.F. (No. 52-2) ¶ 1), implying that most likely he facilitates financing that involves more complex arrangements between his clients and their potential lenders.  Additionally, the Salamon-Cornell Consulting Agreement provides that Salamon's "Scope of Services" was to "provide such advisory services to Cornell with regards to certain business opportunities with entities . . . known to [Salamon]," which "may include various types of financial arrangements, including direct investment by Cornell into these Entities" and that Salamon's "Finders Fee" "[i]n respect to any equity line of credit financing by Cornell to an Entity introduced directly by [Salamon] to Cornell which is made recommended or advised upon by" Salamon, consisted of "ten percent (10%) of the gross stock compensation received by Cornell from the Entity."  (Def.'s Mot. for Summ. J., Ex. A (No. 51).)  Salamon also states in his memorandum supporting his motion for summary judgment that "in connection with its equity-based funding, the consideration Cornell would typically receive would be 'stock' in the company which received the funding."  (Pl.'s Mem. (No. 53) at 24.)  Accordingly, it seems that Salamon was aware that Cornell envisioned entering into securities transactions with any company to which Salamon introduced it.

[6]  A "dealer" is defined as "any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise."  15 U.S.C. § 78c(a)(5)(A).  Salamon is not alleged to be a dealer in this action because all of Teleplus's allegations revolve around the securities transactions entered into between it and Cornell.

NOT FOR PUBLICATION

participation in securities transactions at key points in the chain of distribution.'"" <u>S.E.C. v.</u>

<u>Martino</u>, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (quoting <u>S.E.C. v. Hansen</u>, No. 83-3692,

1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984) (quoting <u>Mass. Fin. Servs., Inc. v. Sec. Investor</u>

<u>Prot. Corp.</u>, 411 F. Supp. 411, 415 (D. Mass. 1976))).  Moreover, factors that can be considered

about an individual alleged to be a broker, include whether he:

> 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3)
> is selling, or previously sold, the securities of other issuers; 4) is involved in
> negotiations between the issuer and the investor; 5) makes valuations as to the
> merits of the investment or gives advice; and 6) is an active rather than passive
> finder of investors.

<u>Id.</u> (quoting <u>Hansen</u>, 1984 WL 2413 at *10).

"In a series of no-action letters, the staff of the Securities and Exchange [C]ommission

('SEC') has indicated that in certain limited circumstances, a person or entity may perform a

narrow scope of activities without triggering booker/dealer [sic] registration requirements,"

known as the finder's exception.  <u>Cornhusker Energy Lexington, LLC v. Prospect St. Ventures</u>,

No. 04-586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006); <u>see also</u> <u>Salamon v. CirTran</u>

<u>Corp.</u>, No. 03-787, 2005 WL 3132343, at *2 (D. Utah Nov. 22, 2005).  "A finder, however, will

be performing the functions of a broker-dealer, triggering registration requirements, if activities

include: analyzing the financial needs of an issuer, recommending or designing financing

methods, involvement in negotiations, discussion of details of securities transactions, making

investment recommendations, and prior involvement in the sale of securities."  <u>Cornhusker</u>

<u>Energy</u>, 2006 WL 2620985 at *6.

-17-

NOT FOR PUBLICATION

Teleplus asserts that Salamon was acting as a broker, extensively quoting from Salamon's Complaint, affidavit, and answers to interrogatories under the heading "The Admitted Facts Prove Salamon Brokered the Teleplus/Cornell Transactions." (Def.'s Mem. in Support of Def.'s Mot. Summ. J. (No. 50) ("Def.'s Mem. (No. 50)") at 26-32.) Further, according to Teleplus, "Salamon has all of the 'badges' of the broker: he claims a 10% commission from TelePlus; . . . he solicited TelePlus' business and numerous other financing sources as well as Cornell and entered into numerous other similar if not identical commission agreements with his 'customers; and, . . . he participated in the negotiations and advised TelePlus." (Id. at 32; see Def.'s Mem. (No. 57) at 6.) Salamon responds that "because [he] was not involved in the negotiations between Teleplus and Cornell, his role did not amount to either 'effecting' or 'attempting to effect' a securities transaction, and that he acted as an 'intermediary' or a 'finder,' rather than a broker." (Pl.'s Mem. (No. 59) at 11.) According to Salamon, "intermediaries may be compensated for relaying basic information between the parties that they introduce." (Pl.'s Reply Mem. in Support of Pl.'s Mot. Summ. J. (No. 64) ("Pl.'s Reply Mem. (No. 64)") at 4-5.) Salamon claims that both Teleplus and Cornell admit that he "was not involved in negotiating or structuring the very sophisticated funding arrangements which Teleplus and Cornell agreed upon after Salamon introduced them" and cites deposition testimony to support this point. (Pl.'s Mem. (No. 59) at 10) at 11-13; see Pl.'s Reply Mem. (No. 64) at 5-6.) Teleplus replies that "the facts simply are that neither TelePlus nor Cornell stated that Salamon did not participate in the negotiations," citing evidence allegedly supporting its claim that Salamon participated in negotiations. (Def.'s Reply Mem. (No. 61) at 4-6.) Further, Teleplus presents that "a finder's

-18-

NOT FOR PUBLICATION

role is limited to simple introductions of the parties, not participating in conference calls and then

exchanging information . . . by email or conversing . . . separately thereafter about . . .

documentation."  (Id. at 6.)

The Court denies both parties' motions for summary judgment on this issue due to the

existence of genuine issues of material fact.  As recounted above in "The Transactions Between

Teleplus and Cornell" subsection of the "Facts and Procedural Background" section, both parties

present evidence which demonstrates different levels of participation by Salamon in the

transactions between Teleplus and Cornell.  A factual determination will be necessary to

determine Salamon's status in these negotiations: Was he a broker or a finder?  In a motion for

summary judgment, the Court is not permitted to weigh evidence, Anderson, 477 U.S. at 249, so

it must now deny both parties' motions for summary judgment to allow the finder of fact later to

sift the evidence to determine the extent of Salamon's participation in the transactions and

whether his status was that of a broker or a finder.

## C.    Equitable Estoppel or Waiver

Salamon presents an affirmative defense of equitable estoppel or waiver to Teleplus's §

29(b) counterclaim.  "Waiver is . . . the voluntary relinquishment of a known right evidenced by

a clear, unequivocal and decisive act from which an intention to relinquish the right can be

based."  Country Chevrolet, Inc. v. Twp. of N. Brunswick Planning Bd., 190 N.J. Super. 376,

380, 463 A.2d 960, 962 (App. Div. 1983).  Equitable estoppel requires "reasonable, detrimental

reliance upon the conduct of the party to be estopped."  Town of Phillipsburg v. Block 1508, Lot

12, 380 N.J. Super. 159, 174, 881 A.2d 749, 758 (App. Div. 2005).

**NOT FOR PUBLICATION**

Referring to Silvasan's deposition and affidavit, Salamon claims that Teleplus "began to suspect in July 2004 that Salamon was not affiliated with the Salomon Brothers investment banking firm" and "had doubts about Salamon's 'status' [at] the time, but did nothing to 'confirm [those] doubts,'" though Teleplus "did not learn that Salamon was not a broker until the Spring of 2005." (Pl.'s Mem. (No. 59) at 24; Pl.'s Reply Mem. (No. 64) at 8-9.)  Accordingly, Salamon asserts that "Teleplus was on 'inquiry notice' that Salamon was not a licensed securities broker in July 2004," (Pl.'s Mem. (No. 59) at 24), but "continu[ed] to accept the benefits of Salamon's performance," meaning "Teleplus became equitably estopped from seeking rescission," (id. at 27).  Teleplus replies that the equitable estoppel defense is "subject to numerous factual disputes which cannot be determined upon summary judgment." (Def.'s Reply Mem. (No. 61) at 10.)  Teleplus also argues that Salamon's assertion regarding Teleplus's being on "inquiry notice" is lacking because Teleplus's suspicions only revolved around Salamon's affiliation with Salomon Brothers, not with his credentials as a registered broker.  (Id. at 10-11.)

The Court finds that Teleplus's knowledge that Salamon did not work for Salomon Brothers was insufficient alone to put Teleplus on inquiry notice that Salamon was not a registered broker.  In fact, Salamon's counsel conceded during oral argument that it was premature for any determination as to whether Teleplus was on inquiry notice regarding Salamon's status.  Moreover, Salamon does not offer any "clear, unequivocal and decisive act" to ground his defense of waiver or any evidence of its "reasonable, detrimental reliance" on Teleplus's conduct to support his defense of equitable estoppel.  Accordingly, Salamon has offered insufficient evidence to allow the Court to grant summary judgment on these grounds.

-20-

NOT FOR PUBLICATION

### D.  Damages

Salamon also argues that Teleplus cannot prove any damages with respect to its § 29(b) counterclaim: "If Salamon hadn't introduced Teleplus to Cornell, Teleplus would not have paid Salamon $100,000, but it also would not have obtained $13 million from Cornell," (Pl.'s Mem. (No. 53) at 8), so "on a 'net basis,' Teleplus has obviously suffered no damages whatsoever and, in fact, has profited by dramatically expanding and increasing the value of the business by means of the funding obtained from Cornell," (id. at 9-10).  Teleplus responds that its § 29(b) counterclaim "does not have to establish damages to be successful: TelePlus merely has to demonstrate that Salamon has violated the law's registration requirements for brokers."  (Def.'s Mem. (No. 57) at 2-3.)

Section 29(b) states only that "[e]very contract made in violation of any provision of this chapter . . . and every contract . . . made, the performance of which involves the violation of . . . any provision of this chapter . . . shall be void," and as such provided there was a violation of § 15(a)(1), Teleplus may maintain its counterclaim and affirmative defense under § 29(b). Moreover, Salamon's bald assertion that "on a 'net basis,' Teleplus has obviously suffered no damages whatsoever," is not supported by any evidence that would allow the Court now to conclude that Teleplus has not suffered any damages.

### 2.  Counterclaim Under the CFA

The CFA states:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection

**NOT FOR PUBLICATION**

> with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

N.J.S.A. § 56:8-2.  "Merchandise" includes "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."  <u>Id.</u> § 56:8-1(c).  "Advertisement" includes "the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan," <u>id.</u> § 56:8-1(a), whereas "sale" includes "any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute," <u>id.</u> § 56:8-1(e).  "Unlawful practices" can take three forms – (1) affirmative acts; (2) knowing omissions; and (3) regulation violations.  <u>Cox v. Sears Roebeck & Co.</u>, 138 N.J. 2, 17, 647 A.2d 454, 462 (1994).  To state a claim under the CFA, a plaintiff must satisfy three elements – "(1) unlawful conduct . . . ; (2) an ascertainable loss . . . ; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." <u>Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.</u>, 192 N.J. 372, 389, 929 A.2d 1076, 1086 (2007) (quotation omitted).

Salamon attacks Teleplus's CFA counterclaim in two ways – (1) the CFA is not applicable in this case; and (2) Teleplus has not demonstrated an "ascertainable loss."  Teleplus tersely responds: "Salamon's motion . . . remains premature because the Court has not yet determined numerous factual issues requiring a trial regarding Salamon's alleged fraudulent

**NOT FOR PUBLICATION**

misrepresentations in a non-securities context . . . i.e., whether the underlying transaction falls within the [CFA]."  (Def.'s Mem. (No. 57) at 14-15.)

### A.     Applicability of the CFA

The CFA's legislative history reveals that "the clear statutory objective is to protect consumers."  Papergraphics Int'l, Inc. v. Correa, 389 N.J. Super. 8, 12, 910 A.2d 625, 628 (App. Div. 2006); see Cox, 138 N.J. at 14-15 (describing the legislative history of the CFA).  "[N]either the term 'consumer' nor 'consumer transaction' is found within the statute's definitional provisions," though.  Papergraphics, 289 N.J. Super. at 12.  New Jersey courts have stated that "the entire thrust of the [CFA] is pointed to products and services sold to consumers in the popular sense" and that "[t]he legislative language throughout the statute and the evils sought to be eliminated point to an intent to protect the consumer in the context of the ordinary meaning of that term in the market place."  Neveroski v. Blair, 141 N.J. Super. 365, 378, 358 A.2d 473, 480 (App. Div. 1976), abrogated, on other grounds, by Arroyo v. Arnold-Baker & Assocs., Inc., 206 N.J. Super. 294, 502 A.2d 106 (Law Div. 1985).  The New Jersey Supreme Court, however, has instructed that "[t]he language of the CFA evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud."  Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264, 696 A.2d 546, 551 (1997).  Despite this instruction of "a broad and liberal reading of the statute," a review of caselaw reveals that "the CFA does not cover every sale in the marketplace" because "CFA applicability hinges on the nature of a transaction, requiring a case by case analysis."  Papergraphics, 389 N.J. Super. at 13 (providing parenthetical overview of caselaw); see Hundred

NOT FOR PUBLICATION

E. Credit Corp. v. Eric Shuster Corp., 212 N.J. Super. 350, 357, 515 A.2d 246, 249 (App. Div. 1986).

When considering whether the CFA is applicable, the Court should first look to the statutory language.  As stated the CFA provides, in part, that "any . . . misrepresentation . . . or omission of any material fact with intent that others rely upon such . . . omission, in connection with the sale or advertisement of any merchandise . . . is declared to be an unlawful practice." N.J.S.A. § 56:8-2.  The definition of "merchandise" includes "services or anything offered, directly or indirectly to the public for sale," id. § 56:8-1(c), and in this case Salamon offered services to facilitate Teleplus's receipt of financing.  The definition of "advertisement" includes "the attempt . . . to induce directly or indirectly any person to enter or not enter into any obligation," id. § 56:8-1(a), and in this case Teleplus alleges that Salamon's misrepresentations and omissions resulted in its execution of the Salamon-Teleplus Consulting Agreement. Accordingly, it would appear that the broad language of the CFA sweeps Teleplus's counterclaim within its scope.

The Court, however, must recognize that "CFA applicability hinges on the nature of a transaction, requiring a case by case analysis."  Papergraphics, 389 N.J. Super. at 13. Specifically, the Court must determine whether the services that Salamon provides are offered to the general public.  See, e.g., S. Broward Hosp. Dist. v. MedQuist, Inc., 516 F. Supp. 2d 370, 399 (D.N.J. 2007); Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F. Supp. 2d 557, 561 (D.N.J. 2002); BOC Group, Inc. v. Lummus Crest, Inc., 251 N.J. Super. 271, 278, 597 A.2d 1109, 1112 (Law Div. 1990).  Salamon describes the services that he provides as "unique" and

-24-

NOT FOR PUBLICATION

claims that he only provides these services "to a select group of corporations for which

traditional asset-collateralized loans are not a viable option."  (Pl.'s Mem. (No. 53) at 21-22.)  In

addition, he posits that "Teleplus is not a 'consumer' in the traditional sense."  (Id.)

Salamon's arguments are lacking.  Aside from his claim to the contrary, Salamon does

not provide any basis for the Court to conclude that his services are unique.  A target client base

of "corporations for which traditional asset-collateralized loans are not a viable option" appears

to the Court to be broader than Salamon implies and could conceivably encompass a reasonable

percentage of corporate entities.[7]  Further, Salamon fails to provide any support for his claim that

"Teleplus is not a 'consumer' in the traditional sense."  The New Jersey Superior Court,

Appellate Division has stated that "[e]ven the most world-wise business entity can be

inexperienced and uninformed in a given consumer transaction.  Unlawful practices thus can

victimize business entities as well as individual consumers."  Hundred E. Credit, 212 N.J. Super.

at 356-57.  Without any further context, the Court is unable to determine that Teleplus is not a

"consumer" for purposes of the CFA.  Accordingly, the Court concludes at this time that the

CFA is applicable in this action and denies Salamon's motion for summary judgment to the

extent that he argues otherwise.[8]

---

[7]  Indeed, in his deposition Salamon admitted that he "[m]aybe" has made "cold calls" to "[m]ore than a thousand" "companies that are looking for funding."  (Dep. (Salamon) at 59:24-60:17.)

[8]  Salamon also argues that "the [CFA] does not apply to where the alleged underlying predicates are securities fraud claims," noting that the CFA "by its terms, applies only to transactions involving either 'merchandise' or 'real estate'" and that "[w]hile 'merchandise' is defined to include 'services,' . . . services as a 'securities broker' were held to be excluded from the scope of the [CFA's] coverage."  (Pl.'s Mem. (No. 53) at 16-17.)  Salamon suggests that the

NOT FOR PUBLICATION

      **B.**      **Ascertainable Loss**

According to the New Jersey Supreme Court, an "ascertainable loss" means "evidence

from which a factfinder could find or infer that [a party] suffered an actual loss." Thiedemann v.

Mercedes-Benz USA, LLC, 183 N.J. 234, 248, 872 A.2d 783, 792 (2005). "[E]ither

out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss

hurdle and will set the stage for establishing the measure of damages." Id.

Salamon provides that "[a]s a result of Salamon's introduction of Teleplus to Cornell,

Teleplus . . . has obtained a total of $13 million in financing from Teleplus," meaning

"Salamon's performance of his contract cannot represent any kind of 'ascertainable loss.'" (Pl.'s

Mem. (No. 53) at 15.)  Further, Salamon claims that if he had not introduced Teleplus to Cornell,

Teleplus would not have received the financing allowing it "to complete the acquisition of at

---

legislative history of the CFA, as well as the interpreting caselaw, supports this conclusion.  (See
id. at 17-21.)

      According to the New Jersey Superior Court, Appellate Division, "a fraud in the sale of
shares of stock or other securities is not within the compass" of the CFA.  Stella v. Dean Witter
Reynolds, Inc., 241 N.J. Super. 55, 75, 574 A.2d 468, 478 (App. Div. 1990); see also Folkman v.
Roster Fin. LLC, Nos. 05-2099, 05-2242, 05-2243, 05-2244 & 05-2245, 2005 WL 2000169, at
*8 (D.N.J. Aug. 16, 2005) ("[T]he [CFA] does not create a cause of action for the sale of
securities products.").  In its Third Amended Answer to Complaint and Counterclaims, Teleplus
claims that Salamon "violated the CFA in three respects," one of which was that "Mr. Salamon
Brothers violated various rules and regulations of the SEC and NASD with respect to registration
of broker/dealers and engaging in securities transactions."  (Third Am. Answer to Compl. &
Countercls. (No. 48) ¶ 53.)  Because this alleged violation of the CFA addresses Salamon's
alleged violations of securities laws, Teleplus cannot maintain its CFA counterclaim on this
basis.  Given that Salamon's position in this action is that he was acting as a finder, not as an
unregistered broker, however, none of the other alleged violations of the CFA necessarily involve
securities fraud violations.  (See id. ¶¶ 22, 53.)

NOT FOR PUBLICATION

least five other companies," given that Silvasan "admitted that the funding which Teleplus obtained from Cornell was used in each of these acquisitions."  (Id. at 9.)

Teleplus claims a loss of $100,000.00 – the amount that it paid pursuant to the Salamon-Teleplus Consulting Agreement before the alleged breach.  Although it may be true that "[w]ithout [Salamon's] introduction TO Cornell, Teleplus would not have obtained $13 million in funding and would not have been able to complete the acquisition of at least five other companies," the Court cannot simply take Salamon's word that "on a 'net basis,' Teleplus obviously suffered no damages whatsoever and, in fact, has profited by dramatically expanding and increasing the value of the business by means of the funding obtained from Cornell." Salamon must provide evidence to support this statement, most obviously in the form of a valuation expert who can quantify the effect of the services that Salamon provided to Teleplus. The only evidence that has been brought to the Court's attention is that Teleplus received $13 million in financing from Cornell, that Silvasan testified that Teleplus used those funds in connection with acquisitions, and that Teleplus paid Salamon $100,000.00.  This evidence is insufficient to allow the Court to conclude at this time that Teleplus did not suffer an ascertainable loss.

### 3.    Breach of Fiduciary Duty Affirmative Defense

"A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." F.G. v. MacDonell, 150 N.J. 550, 563, 696 A.2d 697, 704 (1997).  To prove a breach of fiduciary duty, one "must show that there was an agency relationship between [the parties] and that [the

-27-

NOT FOR PUBLICATION

other party] acted in breach of a duty imposed by the relation." Lankford v. Irby, No. 04-2636,
2006 WL 2828552, at *7 (D.N.J. Sept. 29, 2006); see also Restatement (Third) of Agency § 8.01
("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected
with the agency relationship.").

 "An agency relationship is created when one party consents to have another act on its
behalf, with the principal controlling and directing the acts of the agent." Sears Mortgage Corp.
v. Rose, 134 N.J. 326, 337, 634 A.2d 74, 79 (1993).  The existence of any agreement dictating an
agency relationship is unnecessary, as "'the law will look at [the parties'] conduct and not to their
intent or their words as between themselves but to their factual relation.'" Id. (quoting
Henningsen v. Bloomfield Motors, 32 N.J. 358, 374, 161 A.2d 69, 78 (1960)).

## A. Broker or Finder

 The chief source of disagreement between the parties with respect to Teleplus's breach of
fiduciary duty affirmative defense is, again, whether Salamon served as a broker during
Teleplus's transactions with Cornell or whether he served as a finder or middleman during those
transactions.  The distinction drawn between the broker and the finder or middleman is that the
latter "bring[s] the parties together with no involvement on [his] part in negotiating the price or
any of the other terms of the transaction." M. Dean Kaufman, Inc. v. Am. Machine & Foundry
Co., 102 N.J. Super. 1, 10, 245 A.2d 202, 206 (App. Div. 1968).  A broker has a fiduciary duty to
act in the best interests of his principal.  See In re Merrill Lynch Sec. Litig., 911 F. Supp. 754,
760 (D.N.J. 1995), rev'd, on other grounds, by Newton v. Merrill, Lynch, Pierce, Fenner &
Smith, Inc., 135 F.3d 266 (3d Cir. 1998); Oscar Mayer Corp. v. Mincing Trading Corp., 744 F.

NOT FOR PUBLICATION

Supp. 79, 82 (D.N.J. 1990) (spice broker); <u>Rothman Realty Corp. v. Bereck</u>, 73 N.J. 590, 599,

376 A.2d 902, 906 (1977) (real estate broker); <u>see also</u> 12 C.J.S. Brokers § 8 ("A broker, unlike a

finder, thus carries a defined fiduciary duty to act in the best and more involved interests of the

principal.").  Given that the role of a finder or middleman is limited simply to bringing the parties

together to consummate a transaction on their own, a finder or middleman does not carry the

same fiduciary responsibilities as a broker.  <u>See</u> <u>Feist v. Jerolamon</u>, 81 N.J.L. 437, 439, 75 A.

751, 752 (1910) ("The rule is well established in this state that an agent who assumes to act for

one of the parties in a sale of land is bound to disclose to the other his existing agency . . . .

There is, however, a distinction to be made between the case of one acting as agent and one

acting only as a middleman."); 12 Am. Jur. 2d Brokers § 1 ("A broker is considered a mere

'middleman' and is not necessarily an 'agent' of either party, where the broker's duty consists

merely of bringing parties together so that, between themselves, they may negotiate a sale and the

sale is made in that manner.").

   Regardless of nomenclature, the question really is whether Salamon had an agency

relationship with Teleplus.[9]  If Salamon had such a relationship, he was required to disclose the

terms of his relationship with Cornell to Teleplus and to obtain Teleplus's consent as to his

continued relationship with it.  <u>See</u> Restatement (Third) of Agency § 8.03.

--------

   [9] Although Salamon states that he "does not dispute that a dual agency existed," (Pl.'s Mem. (No. 59) at 27), the qualitative effect of his argument regarding a so-called "middleman" exception is that given his alleged status as a finder or middleman as opposed to a broker, he was not an agent to Teleplus and, accordingly, did not owe it any fiduciary duty.

NOT FOR PUBLICATION

Teleplus states that the Salamon-Teleplus Consulting Agreement provides that "Salamon is TelePlus's agent with a duty to locate a financial source to lend financing to TelePlus." (Def.'s Mem. (No. 50) at 36.)  According to Teleplus, however, "[u]nbeknownst to [it], Salamon was also acting as an undisclosed 'outside agent' for Cornell at the same time," and as such "Salamon's acting as agent for both parties precludes his being compensated as TelePlus' agent." (Id.)  Salamon responds that "[w]hile, generally, 'dual agencies' must be disclosed to both principals, an exception exists where, as here, the 'dual agent' functions merely as an intermediary or 'middleman' and is not involved in the negotiations between his respective principals." (Pl.'s Mem. (No. 59) at 28; Pl.'s Reply Mem. (No. 64) at 11.)  Salamon claims that "[s]ince all the evidence establishes that Salamon did nothing beyond bringing Teleplus and Cornell together, Salamon clearly qualifies as an 'intermediary' or 'middleman,' and is not subject to any prohibition against a dual agency." (Pl.'s Mem. (No. 59) at 29-30; Pl.'s Reply Mem. (No. 64) at 12.)

As with the counterclaim and affirmative defense under § 29(b) of the Exchange Act, the motions for summary judgment with respect to Teleplus's breach of fiduciary duty affirmative defense are denied due to the existence of genuine issues of material fact – namely, whether Salamon's activities were those of a broker or a finder or middleman.  Given that "the law will look at [the parties'] conduct" in determining whether an agency relationship exists, Sears Mortgage, 134 N.J. at 337, it is now premature to draw any conclusions as to Salamon's status.

NOT FOR PUBLICATION

### B.    Additional Arguments

The Court will briefly address four additional arguments presented by Salamon to support the dismissal Teleplus's breach of fiduciary duty affirmative defense.  Salamon's first two arguments can be labeled under the broad heading of "lack of harm to Teleplus."  First, Salamon argues that the $4,000.00 fee that he received from Cornell for referring it to Teleplus was "de minimis and immaterial in light of the $13 million in funding Teleplus has received from Cornell."  (Pl.'s Mem. (No. 59) at 30.)  Salamon points to no caselaw from New Jersey or any other state carving a "de minimis" exception to a breach of fiduciary duty affirmative defense.  The Court is not inclined to assume that because Salamon "only" received $4,000.00 from Cornell, he could not have breached his fiduciary duty to Teleplus.

Second, Salamon argues it is not "conceivable that, if Salamon had obtained such a fee, that it caused any injury to Teleplus" because "[i]f Cornell had kept the entire $40,000 [fee that it received from Teleplus], instead of allocating $4,000 to Salamon . . . it would not have made any difference to Teleplus at all."  (Id. at 30-31.)  Teleplus responds that "should this case go to trial, TelePlus will demonstrate that the SEDA financing offered by Cornell and brokered by Salamon was itself detrimental to TelePlus's market capitalization because the mechanism contained in the SEDA which provides more stock to Cornell as the market price goes down, has artificially depressed TelePlus's market value."  (Def.'s Reply Mem. (No. 61) at 12.)  The only caselaw that Salamon cites in support of this argument is from Louisiana and Georgia, and in both cases, the circumstances are distinguishable, given that neither case addresses this issue in the context of an alleged breach of fiduciary duty.  See LaBorde v. Dastugue, 868 So. 2d 228, 337 (La. Ct. App.

-31-

NOT FOR PUBLICATION

2004) (rejecting plaintiff's argument of "dual agency" with respect to claim of conspiracy);

Magliaro v. Lewis, 417 S.E.2d 395, 397 (Ga. Ct. App. 1992) (rejecting plaintiff's argument of

"dual agency" with respect to claim of fraudulent concealment).  In any event, despite Salamon's

claim to the contrary, a fact finder may conclude that Salamon's alleged breach of fiduciary duty

resulted in Teleplus's receiving a worse deal than if it had had a broker (assuming Salamon is

determined to have that status) with only its interests in mind.

      Third, Salamon maintains that "Teleplus and Cornell have failed to offer any proof that

Cornell did not disclose its arrangement with Salamon to Teleplus."  (Pl.'s Mem. (No. 59) at 31.)

According to Salamon, "if Cornell determined that its agreement with Salamon was material to

Teleplus in light of Teleplus' needs and circumstances, Cornell and Kirkpatrick & Lockhart [–

the firm that represented Cornell in its transactions with Teleplus –] would have had a duty to

disclose, and undoubtedly did disclose, the [Salamon-Cornell Consulting Agreement] prior to

concluding the initial funding arrangements with Teleplus."  (Id. at 31-32; Pl.'s Reply Mem. (No.

64) at 13-14.)  Salmon suggests that under the summary judgment standard, Teleplus is required

to submit an affidavit confirming that Cornell did not disclose this information to it.  (See Pl.'s

Mem. (No. 59) at 32; Pl.'s Reply Mem. (No. 64) at 14.)  Salamon has pointed to no evidence to

support his assertions that Cornell disclosed its relationship with Salamon to Teleplus.  Instead,

he seeks to put the burden on Teleplus to affirmatively disprove something of which there is no

evidence.  The Third Circuit has "repeatedly held that unsubstantiated arguments made in briefs

or at oral argument are not evidence to be considered by this Court."  Versarge v. Twp. of

Clinton N.J., 984 F.2d 1359, 1370 (3d Cir. 1993).

**NOT FOR PUBLICATION**

Fourth, after noting that he first entered into a deal with Cornell and then later entered into a deal with Teleplus, Salamon argues that "[s]ince . . . Salamon had no fiduciary duties – in fact, no relationship at all – with Teleplus back in 2002, when he obtained his agreement with Cornell, his concluding the agreement with Cornell could not possibly have resulted in a breach of any fiduciary duties to Teleplus."  (Pl.'s Mem. (No. 53) at 25.)  Teleplus replies that Salamon's argument is "illogical" because "the admitted facts are that in 2004 upon Salamon's entry into the [Salamon-Teleplus Consulting Agreement] he became an agent of TelePlus while still an agent of Cornell."  (Def.'s Mem. (No. 57) at 14.)   The essence of Teleplus's breach of fiduciary duty affirmative defense is that Salamon was serving two principals, as well as benefitting himself from any potential transactions, without disclosure to Teleplus.  The timeline as to when Salamon entered into the separate agreements with Cornell and Teleplus is irrelevant as to whether he breached his fiduciary duty.

## CONCLUSION

For the stated reasons, Defendant Teleplus Enterprises, Inc.'s and Plaintiff Howard Salamon d/b/a Salamon Brothers's motions for summary judgment are denied.


June 2, 2008                                              **s/William H. Walls**
                                                         United States Senior District Judge

**NOT FOR PUBLICATION**

**Appearances**

Eric W. Berry, Esq.
Eric W. Berry Law Office, P.C.
132 Nassau Street, Suite 1300
New York, NY 10038
                Attorney for Plaintiff

Randall S.D. Jacobs, Esq.
Bienstock & Michael, P.C.
6 Fernwood Drive
Fair Lawn, NJ 07410
                Attorney for Defendant